# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| ASOUSA PARTNERSHIP, | : | Bankruptcy No. 01-12295DWS |
| | : | |
| Debtor. | : | |
| | : | |
| ASOUSA PARTNERSHIP, | : | Adversary No. 04-1012 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SMITHFIELD FOODS, INC., a Virginia Corporation, | : | |
| SHOWCASE FOODS, INC., a Delaware Corporation, | : | |
| JOSEPH W. LUTER, IV, MICHAEL H. COLE, | : | |
| | : | |
| Defendants. | : | |

# MEMORANDUM OPINION

**BY:  DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the court is the Motion for Summary Judgment (the "Motion") of defendants Smithfield Foods, Inc. ("Smithfield"), Showcase Foods, Inc. ("Showcase"), Joseph W. Luter, IV and Michael H. Cole (collectively "Defendants").  For the reasons stated herein, the Motion is denied.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

The Debtor is a Pennsylvania general partnership that owns the land and building(s) located at 980 Glasgow Street, Pottstown, Montgomery County, Pennsylvania (the "Premises").  In or around May 2000, the Debtor entered into a lease for the Premises (the "Lease") with Pennexx Foods, Inc., formerly known as Pinnacle Foods, Inc. ("Pennexx").  A dispute over the Lease arose in late 2000, leading to a civil action in the state court, which was subsequently removed to this Court after Debtor filed its Chapter 11 petition in February 2001.  The result of that adversary action was Pennexx's eviction from the Premises in June 2002 and a subsequent money judgment in September 2003 against Pennexx for damage it inflicted upon the Premises.  See Asousa Partnership v. Pennexx Foods, Inc. f/n/a Pinnacle Foods, Inc. (In re Asousa), Adv. No. 01-974 (the "Pennexx Litigation").

---

[1]  To the extent that some documents on this record are not supported by affidavit, neither party has raised an objection.  "As is true with other material introduced on a summary judgment motion, uncertified or otherwise inadmissible documents may be considered by the court if not challenged."  10A Charles A.Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure §2722, at 384 (1998).  Accord Johnson v. United States Postal Service, 64 F.3d 233, 237 (6th Cir. 1995) (ruling that the "failure to object to evidentiary material submitted in support of a summary judgment motion constitutes a waiver of those objections."); H. Sand & Co., Inc. v. Airtemp Corporation, 934 F.2d 450, 454-55 (2d Cir. 1991) (Rule 56 does not require parties to authenticate documents "where appellee did not challenge the authenticity of the documents in the district court."); Dautremont v. Broadlawns Hospital, 827 F.2d 291, 294-95 (8th Cir. 1987) (affirming summary judgment where appellant failed to object in district court to its consideration of documents not in compliance with Rule 56 and failed to demonstrate that district court's consideration of documents constituted reversible error); Giovacchini v. Perrine (In re Giovacchini), 1995 WL 80102, at *3 n.1 (E.D. Pa. Feb. 27, 1995) (citing Federal Practice and Procedure §2722) (holding that  unauthenticated medical reports would be considered in ruling on motion for summary judgment since no objection was raised thereto).

In the present adversary action Debtor seeks to hold Smithfield/Showcase liable for judgment against Pennexx under a successor liability theory and for alleged conversion of rent monies allegedly escrowed by Pennexx during the lease dispute.[2] The crux of Debtor's claims stems from the fact that on or about June 9, 2003 Smithfield, a creditor that held a controlling interest in Pennexx, took possession of substantially all the assets of Pennexx (the "Asset Transfer"). The exact nature of this transaction is the subject of this adversary action and therefore requires examining the history between Pennexx and Smithfield.

On or about May 31, 2001, i.e. during the pendency of the Pennexx Litigation, Smithfield purchased fifty percent of the outstanding shares of Pennexx for approximately $6 million. Stock Purchase Agreement (Defs. Ex.7); Affidavit of Michael Cole ("Cole Aff.") ¶ 3. (Defs. Ex. 100). Smithfield owns interests in various food companies, operating essentially as a holding company. It has a few services it provides to the operating companies it owns but has no operating facilities and no operating businesses. Deposition of Larry Pope ("Pope Dep.") at 5. (Pls. Ex. 7). Smithfield purchased equity in Pennexx in order to expand its interests in the northeastern United States market of the case-ready meat

---

[2] During the pendency of the lease dispute, upon the advice of its counsel, Pennexx opened a bank account with and deposited rent for the Premises into that account for the period of November 2000 to June - July 2002. Affidavit of John Gallagher, Esquire ("Gallagher Aff.") ¶ 5; Narrative of Joseph Beltrami at Bates No. SFD00017311. (Pls. Ex. 38). Gallagher represented to this Court numerous times the existence of such an account and that Pennexx was paying rent on the Premises into the account. Id. ¶ 11. As discussed below, it appears that the rent monies may have been in more than one account or transferred between accounts, but Asousa and Defendants agree that this money was segregated in some way.

business, of which Pennexx was a key player.[3]  Id. at 8-9; Smithfield Foods, Inc., Annual

Report 2002 at 21.  (Pls. Ex. 117).

At the same time, Smithfield entered into a Standstill Agreement with Michael Queen

(Pennexx's President), Ellis Shore (a Pennexx shareholder, who with Mr. Queen collectively

at that time held a majority of Pennexx's outstanding shares), and  Pennexx. (Defs. Ex. 12);

Cole Aff. ¶ 9.  (Defs. Ex.100).  This agreement provided that, during the Limitation Period

as defined in the Standstill Agreement,[4] (a) the number of directors on Pennexx's Board (then

five) would not change and (b) Smithfield would have the right to nominate two of the five

Board members. Id. ¶ 8(c).  Pursuant to its rights under the Standstill Agreement, Smithfield

nominated two of its executives, Joseph W. Luter, IV, and Michael H. Cole, to the Pennexx

Board of Directors on June 27, 2001. See Deposition Transcript of Michael H. Cole ("Cole

Dep.") at 12.  (Defs. Ex. 100).

Smithfield also agreed, pursuant to a Credit Agreement dated June 27, 2001 (as

amended, the "Credit Agreement"),[5] to extend to Pennexx a line of credit in an amount up

to $30 million.  (Defs. Ex. 8); Cole Aff.  ¶ 4 (Defs. Ex. 100).  Smithfield extended the credit

---

[3]  The case-ready meat business is the wholesaling of  prepackaged cuts of meat to
supermarket chains, which can then place the product directly in their meat cases without having
to do any in-store preparation or packaging.  Id.

[4]  The Standstill Agreement provides that the Limitation Period would end under a
number of contingencies, including when the net worth of Pennexx first fell below $2 million.
Id. ¶ 1(I).

[5]  The Credit Agreement was amended on two occasions. See First Amendment to Credit
Agreement, March 28, 2002 SFD00002448-2451 (Defs. Ex. 10), Cole Affidavit, ¶ 5 (Defs. Ex.
100); Second Amendment to Credit Agreement, December 30, 2002 SFD00046799-810 (Defs.
Ex. 11), Cole Affidavit, ¶ 6 (Defs. Ex. 100).

because both it and Pennexx believed that a capital infusion was essential in order for Pennexx to operate profitably.  Pope Dep. at 12-13 (Pls. Ex. 7).

To secure Pennexx's obligations under the Credit Agreement, Pennexx entered into a Security Agreement (collectively with the Credit Agreement, the "Loan Documents") granting Smithfield a blanket lien and security interest in all of Pennexx's property (the "Collateral").  (Defs. Ex. 9); Cole Aff. ¶ 7(Defs. Ex. 100).  The definition of Collateral in the Loan Documents covers both existing and after-acquired assets, including equipment, inventory, receivables, investment property, as well as more amorphous collateral such as "General Intangibles"[6] and "Intellectual Property Collateral".[7]  Security Agreement §2.1. The Credit Agreement specifies that, in the event Pennexx defaulted on its repayment obligations or breaches any of the covenants or other obligations laid out in the Agreement, Smithfield "shall have . . . all the rights and remedies provided for in the U.C.C. [and] all such rights (including the right of foreclosure) with respect to the Collateral as provided in the Security Agreement."  Credit Agreement, § 8.4.

It is unclear on this record when Smithfield became aware of Pennexx's lease dispute with Asousa.  Smithfield does concede that it knew from the beginning of its relationship with Pennexx that Pennexx would be looking for a new location to expand its operation.

---

[6]  This defined term includes, *inter alia*,  causes of action of every kind and nature, rights and interests in other entities, and goodwill.  Credit Agreement § 1.1.

[7]  Intellectual Property Collateral includes other defined terms: Computer Hardware and Software Collateral, Copyright Collateral, Trademark Collateral and Trade Secret Collateral. Credit Agreement § 1.1.  According to the schedules attached to the Credit Agreement, it does not appear Pennexx owned any copyrights, trademarks, or patents.  Whether it subsequently acquired any such intellectual property is not addressed on this record.

Deposition of Daniel Stevens ("Stevens Dep.") at 28 (Pls. Ex. 6).  On April 2, 2002, i.e two

months before its eviction from the Premises, Pennexx purchased a new facility at 5501

Tabor Road in Philadelphia, Pennsylvania (the "Tabor Road Facility").  Affidavit of Daniel

Stevens ("Stevens Aff.") ¶ 7 (Defs. Ex. 98). Smithfield loaned Pennexx the funds to purchase

and renovate the Tabor Road Facility. Id. ¶ 8.

The renovation of the Tabor Road Facility began on May 1, 2002 and was completed

on December 30, 2002.  (Pls. Exs. 59-60).  The extent to which Smithfield exercised any

control over the design and renovation of the Tabor Road Facility is disputed.  Smithfield

asserts that it merely assigned certain Smithfield project engineers to assist Pennexx in the

design and renovation of the facility because Pennexx lacked the necessary engineering

expertise. See Deposition of Joseph W. Luter ("Luter Dep.") at 30 (Defs. Ex. 88).  Asousa

contends that Smithfield exercised substantial control over the plant renovation.  Smithfield

engineers Robert McClain and Mike Timmons were the designated "project leaders."  See

Pennexx Implementation Task Team list (Pls. Ex. 57); Deposition of Mike Timmons

("Timmons' Dep.") at 13-16 (Pls. Ex. 15).  It also appears that the bulk of purchase orders

generated in connection with the project were issued directly by employees of Smithfield or

its subsidiaries, (Pls. Ex. 85), though it is unclear who was ultimately in charge of the

purchasing decisions.  See Timmons Dep. at 16; Balance Sheet differentiating expenses

approved by Mike Timmons and expenses approved by Mike Queen (Defs. Ex. 111).

By the late summer or fall of 2002, Smithfield became concerned about Pennexx's

declining financial performance and accordingly began monitoring Pennexx more closely.

See, e.g., Stevens Dep. at 15-16 at (Defs. Ex. 104); Larry Pope Memo (Pls. Ex. 78).  Indeed, it appears that Pennexx was approaching a negative net value.  Id.  In a series of letters dated September 25-30, 2002 Smithfield informed Pennexx of its concerns over Pennexx's financial decline and potential defaults under the Credit Agreement, including the provision that Pennexx net worth not drop to zero or less (the "Net Worth Covenant").  Pennexx and Smithfield negotiated Smithfield's forbearance of its default rights until October 30, 2002. (Pls. Exs. 103-104; Defs. Ex. 16).

The transmittal of these letters coincides with a Pennexx board meeting conducted over the course of several telephone conferences between Sept. 24-27, 2002.  The content of the letters was a subject of contention between the Smithfield and non-Smithfield members of the Pennexx board.  See Board Minutes (Pls. Ex. 89).  The meeting resulted in the board voting 3-2, against the Smithfield members, in favor of issuing additional securities to raise capital in order to avoid defaulting under the Credit Agreement.  Queen Dep. at 62 (Defs. Ex. 91); Pennex Board Minutes at 10.[8]  In November 2002, Pennexx sold two million shares of its common stock through a private placement.  As a result, Smithfield's ownership percentage in Pennexx declined to 46.30%.  Queen Dep. at 59, 62.  Plaintiff's Objections and Responses to Defendants' Second Set of Requests for Admission to Asousa Partnership, at 6 (Defs. Ex. 6). Cole Aff. ¶ 10 (Defs. Ex. 100).

---

[8] The minutes indicate that Luter and Cole voted against the securities sale because they had concerns regarding the sufficiency of Pennexx's disclosures in the offering documents. Pennexx Board Minutes at 5-7. Cole Letter to Queen dated Sept. 23, 2002 (Defs. Ex. 17); Cole Dep. at 32 (Defs. Ex. 84); Luter Dep at 20 (Defs. Ex. 88).

Asousa and Smithfield agree that Pennexx continued having financial difficulties following the sale of common stock. Pls. Mem. at 13 ("From September 30, 2002, until June 9, 2002 . . . Pennexx was insolvent.") Defs. Mem. at 9 ("Despite the public offering, Pennexx continued to default on its obligations as set out in the Credit Agreement.")(citing Stevens Dep. at 23 (Defs. Ex. 104)). Indeed, the record indicates that Pennnex was in default of the Negative Net Worth Covenant from at least September 30, 2002 through February 28, 2003. See Smithfield letters granting waivers of default and future non-compliance (Defs. Exs. Ex. 18-20, 26); Stevens Aff. ¶¶ 11-15; April 3, 2003 Letter from Pennexx CFO John Beltrami acknowledging defaults and waivers (Defs. Ex. 32).[9]

In December 2002, Smithfield approached Mike Queen and asked if Pennexx would refinance certain equipment that it had purchased with loan proceeds from Smithfield so as to make a substantial payment on its debt to Smithfield and therefore increase Smithfield's liquidity. Mike Queen agreed and on December 31, 2002 Pennexx sold the equipment, the amount and value of which is disputed, to Commerce Bank. The proceeds from the sale, approximately $9.8 million, were paid to Smithfield to reduce Pennexx's loan obligations to Smithfield. (Pls. Ex. 42). Pennexx then entered into an operating lease program with

---

[9] Smithfield's letter dated December 31, 2002, indicates a willingness to grant a waiver of the Net Worth Covenant until July 1, 2003, subject to certain conditions. (Defs. Ex. 20). However, it is unclear whether those conditions were ever met. Stevens Dep. at 32-33.

Smithfield's letter of January 15, 2003 granted another waiver of the Net Worth Covenant through June 30, 2003, conditioned on Pennexx remaining current with its payables due to Smithfield affiliates. Otherwise, the waiver would expire February 28, 2003. (Defs. Ex. 26). Pennexx did not remain current on those payables. Stevens Dep. at 34-35; May 7, 2003 Letter from Larry Pope to Mike Queen (Defs. Ex. 29).

Commerce Commercial Leasing, LLC (collectively, "Commerce" and the "Commerce Transaction"), under which Commerce then leased approximately $12 million worth of equipment to Pennexx.  Stevens Dep. at 117-120 (Pls. Ex. 5); Stevens Aff., ¶ 18 (Defs. Ex. 98); Deposition of Orville E. Lunking ("Lunking Dep.") at 145 (Pls. Ex. 4).  Smithfield guaranteed Pennexx's obligations under the lease with Commerce.  See Guaranty Agreement between Commerce and Smithfield (Defs. Ex. 22); Stevens Aff. ¶ 20.[10]

Asousa characterizes the Commerce Transaction as forced upon Pennexx, beneficial only to Smithfield, and harmful to Pennexx.  There are disputed issues of fact as to the benefit or harm of the Commerce Transaction to Pennexx.[11]  As to the allegedly coercive aspect of the transaction, there is testimony from Mike Queen that Smithfield contacted him at the end of the day December 31, 2002, a deadline that would affect certain tax incentives with regard to the Commerce Transaction, and conditioned its guarantee of the Commerce Lease upon terms which are not clear on this record.  In any case, Queen stated that he had no choice but to agree to terms set by Smithfield.  Queen Dep. at 40.

---

[10]  On this same date as the Commerce Transaction, as part of an amendment to the Credit Agreement, Smithfield obtained a mortgage upon the Tabor Road Facility giving it a first priority lien upon the real estate, fixtures and equipment (the "Mortgage").  (Defs. Exs. 10, 23). The Mortgage included a provision for confession of judgment in the event of default.  (Defs. Ex. 10).

[11]  Asousa argues rather simplistically that Pennexx undertook $12 million in debt to pay off $9.8 million to Smithfield with no concurrent benefit.  However, there is a question of fact as to whether Pennexx leased additional equipment from Commerce that it had not previously owned.  See e.g. Defs. Ex. 113.  Moreover, it appears that Pennexx may have received a better interest rate under the Commerce Lease than it did under the Credit Agreement with Smithfield. See Lunking Dep. at 145.

By letter dated January 13, 2003, Larry Pope informed Mike Queen that Dan Stevens would be monitoring Pennexx's monthly results and that Pope would personally call every quarter to review financial information. (Defs. Ex. 24). Shortly thereafter, the Smithfield members of the Pennexx Board, Luter and Cole, resigned their positions on the Board. See Letter of resignation dated January 23, 2003 (Defs. Ex. 25). At the end of January, Pennexx sold an additional 2.85 million shares of common stock through a private placement, further diluting Smithfield's ownership interest in Pennexx to 41.26%. Cole Aff. ¶ 13 (Defs. Ex. 100).

By letters dated March 28 and 31, 2003, Smithfield granted Pennexx additional waivers of non-compliance with other terms of the Credit Agreement, ie. proper computation of the "borrowing base" through March 31 and waiver of Pennexx's violation of the limitation on capital expenditures for fiscal year ending December 31, 2002. (Defs. Exs. 27 and 28). The letters bear the signature of Mike Queen acknowledging and agreeing with their content. Id.

By letter dated May 7, 2003, Smithfield informed Pennexx that it was in default of various terms of the Credit Agreement, including the Net Worth Covenant, and that any waivers had expired. Smithfield declared the entire loan amount to be due and owing and, in the event Pennexx could not pay, Smithfield was prepared to discuss peaceful possession of the Collateral. (Defs. Ex. 29).

On May 19, 2003, Smithfield initiated two legal actions against Pennexx. First it filed suit in the Court of Common Pleas of Philadelphia, Pennsylvania seeking possession of

Pennexx's real property pursuant to the confession of judgment provision of the Mortgage. Smithfield Foods, Inc. v. Pennexx Foods, Inc. (Pa. Ct. Comm. Pl. May 19, 2003) (Defs. Ex. 31) (the "State Possession Action"). The Court of Common Pleas entered judgment against Pennexx and awarded Smithfield possession of Pennexx's real property that same day. (Defs. Ex. 33).

The second litigation Smithfield initiated that day was a civil action in the United States District Court for the Eastern District of Pennsylvania, seeking replevin of all of the tangible personal property identified as Collateral under the Credit Agreement (the "Replevin Action"). Smithfield Foods, Inc. v. Pennexx Foods, Inc., No. 03-3155 (E.D. Pa. May 19, 2003) (Defs. Ex. 34-35). On May 22, 2003, following an emergency hearing before the Honorable Charles R. Weiner, the District Court entered an order instructing the United States Marshall to seize all tangible property located at Pennexx's Tabor Road Facility and place it in possession of Joseph Beltrami, then CFO of Pennexx (the "Writ of Seizure Order"). (Defs. Ex. 36). Smithfield scheduled an auction for May 30, 2003 and published notices of the auction in the Legal Intelligencer and the Philadelphia Inquirer. (Defs. Exs. 37-38).[12]

Pennex sought reconsideration of the Writ of Seizure Order. See Motion for Reconsideration filed May 27, 2003 (Defs. Ex. 39). On May 30, 2003, before the Court ruled on Pennexx's Motion for Reconsideration and before the auction was conducted, the Court entered a Stipulated Order allowing Pennexx until 2:00 p.m. that day (the "Extension

---

[12] I cannot discern from the auction notices how much of the Collateral was slated for auction.

Period") to satisfy its outstanding obligations under the Credit Agreement or to post a

counterbond. (Defs. Ex. 40).  The stipulated order further stated that Pennexx's failure to do

so would result in Smithfield's ability to exercise any and all remedies available under the

Writ of Seizure Order.

Later that same day the District Court entered another order incorporating a

Forbearance and Peaceful Possession Agreement signed by Pennexx and Smithfield (the

"Forbearance Agreement"), settling all claims between them.  The order provided that the

Forbearance Agreement was a "reasonable resolution of all matters" between the parties and

that it "shall be fully enforceable by this Court as a Consent Decree."  (Defs. Ex. 1).[13]  The

Forbearance Agreement provided, *inter alia*:

> 1.  Smithfield would forbear from exercising any of its rights and remedies
> under the Writ of Seizure until June 18, 2003, providing no Default, as defined
> by the Forbearance Agreement, occurred during that period.  Id. ¶2;[14]
>
> 2.  On or before June 9, 2003, at 3:00 p.m., Pennexx would pay Smithfield
> $13,019,651.59[15] plus a set amount of interest each day from the date of
> signing, Forbearance Agreement Id. ¶ 3;
>
> 3.  Pennexx would provide an absolute and irrevocable release of Smithfield
> from the Guarantee Agreement covering the Commerce lease no later than
> June 18, 2003;
>
> 4.  Upon a Default, Pennexx agreed to grant Smithfield immediate peaceful
> possession of all of the Collateral.  Id. ¶ 5.

---

[13]  The District Court subsequently denied Pennexx's reconsideration motion as moot.

[14]  Default is a defined term which includes Pennexx's failure to make payment under ¶ 3.
Id. ¶ 6.

[15]  This amount represented Pennexx's outstanding loan obligations to Smithfield, monies
owed to Smithfield affiliates for products, and the fee for Smithfield's guarantee of the
Commerce Transaction.  Id.

Pennexx did not raise the funds to pay Smithfield the amount required under the Forbearance Agreement by June 9, 2003. Plaintiff's Objections and Answers to Defendants' Second Set of Requests for Admission at 14-15(Defs. Ex. 6). Smithfield took possession of the Collateral, ie. all of Pennexx assets, as of June 9 (the "Asset Turnover"). Deposition of Craig Liegel ("Liegel Dep.") at 183 (Pls. Ex. 2); Stevens Dep. at 49 (Pls. Ex. 5). Showcase Foods, Inc., originally called Pennexx Acquisition Sub, Inc., was incorporated in Delaware as a new legal entity on June 9, 2003. See Certificate of Incorporation of Pennexx Acquisition Sub, Inc. (Defs. Ex. 44); Cole Aff. ¶ 20 (Defs. Ex. 100).[16] The real property, i.e. the Tabor Road Facility, was transferred from Pennexx to Showcase through a deed in lieu of foreclosure dated June 11, 2003. Cole Aff. ¶ 18 (Defs. Ex. 100)[17]; Deed (Dfs. Ex. 43).

Although it is unclear when, Smithfield decided to keep the Tabor Plant Facility operating under the Showcase name. On June 11, 2003, a group from Smithfield Beef Group, a Smithfield wholly-owned subsidiary, arrived at the Tabor Road Facility to oversee the operations at the plant. The group included Rich Vesta, the President of the Smithfield Beef Group, Craig Liegel, the CFO of the Smithfield Beef Group, Robert Daubenspeck, the Group Vice President of Human Resources of the Smithfield Beef Group. Liegel Dep.

---

[16] The name of Pennexx Acquisition Sub, Inc. was changed to Showcase Foods, Inc. on June 18, 2003. See Certificate of Amendment of Incorporation (Defs. Ex. 48); Cole Affidavit, ¶ 21 (Defs. Ex. 100). Showcase is a wholly owned subsidiary of Moyer Packing Co., which is a wholly owned subsidiary of the Smithfield Beef Group, Inc. (the "Smithfield Beef Group"), which is in turn a wholly owned subsidiary of Smithfield. Vesta Dep. at 132.

[17] It is unclear how Showcase obtained title to the other Collateral. Compare Cole Aff. ¶ 18 (asserting the "personal property collateral" was sold by Smithfield to Showcase in a private sale), with Stevens e-mail to Beltrami dated 8/7/2003 ("I don't think we sold the assets to Showcase, I think we just transferred them") (Pls. Ex. 32)

12/6/05 at 102 (Defs. Ex. 106); Affidavit of Robert Daubenspeck ("Daubenspeck Aff."), ¶¶

2, 4 (Defs. Ex. 99) Vesta Dep. at 27-30 (Pls. Ex. 8); Flight Manifest (Defs. Ex. 49).

However, there was no interruption in the operation of the Tabor Road Facility.  Vesta Dep.

at 65.

Mike Queen  remained at the Tabor Road Facility sometime between a few days and

two weeks.  Compare Queen Dep. at 13 (Pls. Ex. 11) (two weeks) with Vesta Dep. at 40-41

(Pls. Ex. 8) (left within the first week).  There appears to be no dispute that Queen had no

authority after the arrival of the Showcase team and only assisted in the transition of

operations from the corporate entity of Pennexx to Showcase.  Queen Dep. at 7 ("I agreed

I would stay for two weeks and hand over the company and wouldn't take anything"); Vesta

Dep. at 39-40 (" . . . his involvement needed to be very limited at that point"); Beltrami Dep.

at 230 (Defs. Ex. 83) (answering "no" to inquiry whether Mr. Queen was in charge during

his time at Pennexx following the Asset Turnover); Lunking Dep. at 105 ("Michael Queen

was not running the business after the [Asset Transfer]").[18]

Other higher Pennexx management employees stayed on for varying periods of time.

Joseph Beltrami, Pennexx's former CFO, continued to work as CFO of Showcase until

September 1, 2003.  Beltrami Dep. at 30 (Defs. Ex. 83); Liegel Dep. at 48 (Defs. Ex. 86).[19]

Showcase retained Pennexx's Chief Operating Officer, Dennis Bland, under the position

---

[18] Mr. Queen testified that Smithfield offered to retain him, though it is unclear in what
capacity.  Queen Dep. at 18-19 (Pls. Ex. 11).

[19]  Beltrami and Liegel both characterize Beltrami's role as transitional.  While
Defendants now appear to be downplaying his duties, Defendants' Mem. at 22, they have not
withdrawn their position that Beltrami nevertheless held the title of CFO of Showcase, a position
that appeared to have more importance when Defendants sought to invoke an attorney-client
privilege as to communications between Beltrami and Smithfield counsel.

Vice President of Sales and Marketing (Pls. Ex. 124).[20]  Finally, Donald Countryman, Pennexx's former Vice President of Quality Assurance, remained for a period of a "few weeks." Daubenspeck Aff. ¶ 13.[21]

With respect to lower management and hourly employees, there was little, if any, change.  Showcase hired Pennexx's former manager of floor operations, Allen Dubolino, to supervise the daily operations of the plant.  It also hired Pennexx's former controller and sales manager.  Defs.' Mem. at 22; Lunking Dep at 107 (Pls. Ex. 4).  Defendants further concede that Showcase hired all of the former hourly employees at the same rate of pay that they received while working with Pennexx, and counted their service with Pennexx toward their seniority.  Debtor's Mem. at 23; Liegel Dep. at 141 (Pls. Ex. 2); Queen Dep at 16-17 (Pls. Ex. 11).

Showcase continued manufacturing case-ready meat, serving all or substantially all the customers formerly served by Pennexx.  Stipulated Facts.  (Pls. Ex. 125).  Between June of 2003 and September 2004 Showcase operated at a loss of $17 million, after which it ceased operations.  Liegel Aff. ¶ 24 (Defs. Ex. 101).

The value of the Collateral at the time of the Asset Transfer is a significant factual issue. Defendants have proffered the expert report of Joseph J. Mickle of Valuation Research Corporation for its valuation of the Collateral as of June 10, 2003 ("VRC" and the "VRC Report").  (Defs. Ex. 69).   The VRC Report provides a "fair market" valuation of $5.318

---

[20]  Plaintiff's Exhibit 124 is a chart of employees produced by Smithfield in response to Asousa's discovery request.

[21]  Mr. Daubenspeak's affidavit is silent as to the circumstances of Countryman's departure.

million for the real property, building, and fixtures at the Tabor Road Facility (the "Real

Property"). Exhibit C to VRC Report.[22]  The report also provides both a "Value-In-Use" and

"liquidation" valuation for "Personal Property"[23] at the Tabor Road Facility ranging from

$3.8 million to $1.3 million.[24]  Exhibits D-E to VRC Report.

Although Asousa proffered no expert witness, it identifies a valuation placed upon the

Tabor Road Facility by Smithfield employees, including a "building replacement cost"

valuation of $34.9 million, provided by Mike Timmons, the Smithfield engineer that was one

of the "project leaders" on the renovation of the Tabor Road Facility. (Pls. Ex. 61). See also

Pope Dep. at 43 (estimating value of $15 million).  While the VRC Report contains schedules

listing all of the equipment valued, Timmons' valuation simply identifies categories of

equipment, making it impossible to determine whether he is valuing the same items as

Mickle.  Similarly, Pope's estimate is in response to the rather vague question of the value

of "the facility" with no specific identification as to what is included under that term.


**DISCUSSION**

---

[22]  The VRC Report begins with a Real Property value of $8.1 million and deducts $2.719
million for fixed equipment that is subject to the Commerce Lease. Id. at 3.  VRC was instructed
by Smithfield to exclude leased equipment from its valuation.  Mickle Dep. at 72; VRC Service
Order (Pls. Ex. 112).

[23]  The VRC Report identifies "Personal Property" as "the company owned machinery
and equipment, plant furniture and equipment, office furniture and equipment, computer
equipment, computer software, and vehicles.  VRC Report at 1 (Defs. Ex. 69).

[24]  The liquidation valuation is further broken down into  "forced liquidation" and
"orderly liquidation values.  Mickle opines that a forced liquidation analysis is the most
appropriate as to the Personal Property.  VRC Report at 4.

A motion for summary judgment is governed by Federal Rules of Civil Procedure 56, applicable in this proceeding pursuant to Federal Rule of Bankruptcy 7056. Summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party moving for summary judgment must overcome the initial burden of demonstrating the absence of a material question of fact. Celotex v. Catrett, 477 U.S. 317, 325 (1986). The substantive law will determine which facts are material. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Id. at 255. A court must find that the motion alleges facts which, if proven at trial, would require a directed verdict. 6 J. Moore, Moore's Federal Practice, ¶ 56.26 (2d ed. 1988). If so, the respondent "must set forth specific facts showing there is a genuine issue for trial," and may not "rest upon the mere allegations or denials of the pleading." Fed. R. Civ P. 56(e). If the non-movant's evidence "is merely colorable, or is not significantly probative, summary judgement may be granted. Anderson, 477 U.S. at 250. However, as it is the moving party's burden to demonstrate the absence of genuine issues of material fact, even if the opposing party fails to file contravening affidavits or other evidence that establishes a genuine issue of material fact, summary judgment must still be warranted and will be denied where the movant's own papers demonstrate the existence of material factual issues. Drexel v. Union Prescription Centers, Inc., 582 F.2d 781, 790 (3d Cir. 1978) (citing Adickes v. S.H.Kress &

Co., 398 U.S. 144, 159-61 (1990) (citations omitted).  See Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir. 1985).  The absence of a genuine issue for trial is evident where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. Mashusita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## Count I - Successor Liability

Both Asousa and Defendants acknowledge the same general rule that, "'when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property.'"  Continental Ins. Co. v. Schneider, Inc., 810 A.2d 127, 131 (Pa. Super. 2002)(quoting   Hill v. Trailmobile, Inc., 603 A.2d 602, 605 (Pa. Super.1992)); accord Polius v. Clark Equip. Co., 802 F.2d 75, 77 (3d Cir.1986).[25]

As with most general rules, however, there are recognized exceptions.  Successor liability will be imposed where:

> 1) the purchaser expressly or impliedly agreed to assume the obligations; 2) the transaction amounted to a consolidation or merger; 3) the purchasing corporation was merely a continuation of the selling corporation; 4) the transaction was fraudulently entered into to escape liability; and 5) the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation.

810 A.2d at 130; accord 802 F.2d at 78.  Asousa asserts all but the first exception are applicable with regard to the Asset Transfer.[26]

---

[25]  The parties both cite to Pennsylvania law on the issue of successor liability as well as the other state law claims.

[26]  The Amended Complaint alleges successor liability on the basis that the Asset
(continued...)

A.  De Facto Merger/Continuation Theory

The second and third exceptions, i.e mere continuation and *de facto* merger, are very similar doctrines and are generally treated identically.  Berg Chilling Systems, Inc. v. Hull Corp., 435 F.3d 455, 464 (3d Cir. Jan 31, 2006); Continental, 810 A.2d at 227.  The mere continuation exception questions whether the asset transfer results in "one corporation which merely changes its form and ordinarily ceases to exist upon the creation of the new corporation which is its successor."  810 A.2d at 227.  The major elements of this exception are identity of the officers, directors, or shareholders, and the existence of a single corporation following the transfer.  Id.  The *de facto* merger doctrine identifies four similar factors:

> (1) continuity of ownership; (2) cessation of the ordinary business by, and dissolution of, the predecessor as soon as practicable; (3) assumption by the successor of liabilities ordinarily necessary for uninterrupted continuation of the business; and (4) continuity of the management, personnel, physical location, and the general business operation.

Id.; Commonwealth v. Lavelle, 555 A.2d 218, 228 (Pa. Super. 1989).  See also Berg Chilling, 435 F.3d at 468-69.[27]  Though each of these factors is considered, they do not all have to be

_____

[26](...continued)
Transfer was:  (i) a consolidation or defacto merger, (ii) a mere continuation of Pinnacle's business,
(iii) a fraudulent conveyance, (iv) a breach of the Defendants' fiduciary duties to the creditors of Pinnacle, and/or (v) a transfer of Pinnacle's assets without adequate consideration and without making provisions for the creditors of Pinnacle (including the Debtor).  Amended Compl. ¶ 43.
I note that the successor liability exception enunciated in  Continental does not include breach of fiduciary duty as a basis.  However, such a breach is also alleged as a separate claim in Count II.

[27] Berg purports to apply Pennsylvania law, but phrases the factors in a slightly different
(continued...)

-19-

present.  Rather, the factors are merely indicia of a *de facto* merger.  Continental, Lavelle,

supra.  Given the identical application of the two doctrines, I will address only  the *de facto*

merger factors.  Berg Chilling, 435 F.3d at 468.  Finally, in determining whether a *de facto*

merger has occurred, the Third Circuit Court of Appeals has cautioned: "because of the

complex nature of corporate reorganizations and acquisitions the intrinsic nature of a

transaction cannot be ascertained merely from the form by which it is structured.  It is the

duty of the court to examine the substance of the transaction to ascertain its purpose and true

intent."  Philadelphia Elec. Co. v. Hercules, Inc.,  762 F.2d 303, 310 (3d Cir. 1985).

(1)

---

[27](...continued)
manner:

> (1) There is a continuation of the enterprise of the seller corporation, so that there
> is continuity of management, personnel, physical location, assets, and general
> business operations.
> (2) There is a continuity of shareholders which results from the purchasing
> corporation paying for the acquired assets with shares of its own stock, this stock
> ultimately coming to be held by the shareholders of the seller corporation so that
> they become a constituent part of the purchasing corporation.
> (3) The seller corporation ceases its ordinary business operations, liquidates, and
> dissolves as soon as legally and practically possible.
> (4) The purchasing corporation assumes those obligations of the seller ordinarily
> necessary for the uninterrupted continuation of normal business operations of the
> seller corporation.

Id.  Though I do not find the differences to be significant for purposes of the Motion, I note that
these Third Circuit factors appear to originate under a more general common law standard of de
facto merger rather than specifically Pennsylvania law.  See United States v. General Battery
Corp., 423 F.3d 294, 305 (3d Cir. 2005) (applying identical factors under a common law de facto
merger standard for purposes of determining successor liability under federal CERCLA statute);
Philadelphia Electric Co. v. Hercules, Inc., 762 F.2d 303, 310 (3d Cir.1985) (applying identical
factors and citing to Pennsylvania, Michigan, and New Jersey case law).

Defendants assert that the first prong, continuity of ownership, absolutely requires a transfer of stock between Smithfield/Showcase and Pennexx.  Such an approach has been rejected by the Third Circuit Court of Appeals:

> The continuity of shareholders element is designed to identify situations where the shareholders of a seller corporation retain some ownership interest in their assets after cleansing those assets of liability.
>
> But the cases do not, . . . distinguish sharply between transactions "primarily" for cash versus stock, or between large versus small percentage interests in the ongoing enterprise. Rather, only some continuity of ownership is required. There is no generally accepted common law distinction between primarily stock mergers, on the one hand, and primarily cash transactions, on the other. Nor does successor liability necessarily turn on the seller's percentage interest in the buyer. . . .the critical "continuity of ownership" inquiry appears to be whether the owners retained some ongoing interest in their assets.

General Battery, 423 F.3d at 307; accord Berg 435 F.3d at 469 (expressly rejecting necessity of stock  transfer to meet "continuity of ownership factor); Main, Inc. v. Blatstein (In re Main,Inc.), 1999 WL 424296, at *10 (E.D. Pa. June 23, 1999) ("[a] transfer of stock is unnecessary to demonstrate a continuity of ownership when there is no doubt that the owners of the buyer and the seller corporations are the same."); Miller v. Dutil (In re Total Containment, Inc.), 335 B.R. 589, 617-18 (Bankr. E.D. Pa. Dec. 18, 2005) (Complaint sufficiently alleged *de facto* merger where company transferring assets was 71.08% owned by same corporation that owned 100% of company that received assets).

There is no question that Smithfield held (and continues to hold) a 41.26% ownership interest in Pennexx at the time of the transfer of assets to Showcase, an entity in which

Smithfield holds a 100% interest.  Thus, it would appear that sufficient continuity of ownership exists between Pennexx and Showcase.

(2)

The second indicia of a *de facto* merger is a "cessation of the ordinary business by, and dissolution of, the predecessor as soon as practicable" <u>Continental</u>, 810 A.2d at 135. Although recognizing that "an essential characteristic of a merger is that one corporation survives while another ceases to exist," the Third Circuit Court of Appeals has made clear that the continued legal existence of the transferor corporate entity, without more, will not preclude a finding of a *de facto* merger.  <u>General Battery</u>, 423 F.3d at 308 (finding second prong of *de facto* merger where selling corporation immediately ceased ordinary business functions and existed only as a corporate shell).  <u>See</u> <u>also</u> <u>In re Main</u>, 1999 WL 424296 at *10 (finding *de facto* merger where selling corporation technically remained in existence but had no substance); <u>Total Containment</u>, 335 B.R. at 618 (denying motion to dismiss where complaint alleged that transferring company ceased operations despite formal corporate existence); <u>Continental</u>, 810 A.2d at 127, 135 (finding *de facto* merger where transferring company was empty shell that ceased all ordinary business transactions).  There is no question that while Pennexx remained in existence as a corporate entity, it ceased operations in the meat processing industry after the Asset Transfer and that it has no remaining assets or employees.  Queen Dep. at 8. (Defs. Exh. 91).

Defendants argue that Pennexx remains a "publicly traded corporation," <u>i.e.</u> that its shares are still being traded on the open market.  Defendants' Mem. at 41-42.  Even if this

-22-

is true, a fact not clear on this record,[28] Defendants cite no legal authority to persuade me that this constitutes activity by Pennexx such that it is more than an empty corporate shell.

Defendants also argue that Pennexx is an "active litigant" in the lawsuits to which it is a nominal party, i.e. the Replevin Action and a securities lawsuit filed against Pennexx by some of its shareholders. See Winer Family Trust v. Queen, et al. (E.D. Pa. July 24, 2003), No. 03-4318 (the "Winer Family Litigation"). The docket reports for those cases indicate filings by counsel on behalf of Pennexx and Queen subsequent to June 9, 2003. Indeed, a notice of appeal of the dismissal of Pennexx's cross-claim against Smithfield in the Weiner Family Litigation was filed in June 2005. Defendants rely on Long John Silver's, Inc. v. Architectural Engineering Products Co., 520 F.Supp. 753, (W.D. Pa. 1981) to support the proposition that the asset seller/transferor's participation in litigation is sufficient to indicate that the transferee corporation is not a mere continuation of the old corporation. In that case, the manufacturer of patented acrylic film used to coat roofs (the "predecessor corporation") sold that portion of its business to a company which had been formed to conduct the sale of film (the "successor corporation"). While the court noted that the predecessor corporation filed an appearance and actively participated in the litigation, it also found that the predecessor corporation sold only a portion of its business and in fact "continued as a substantial on-going business entity." Id. at 758-49.

---

[28] The only evidence in support of this assertion is the statement in the affidavit of Smithfield's Vice President and General Counsel, Cole, that "Pennexx remains a public corporation, and its stock continues to be traded on the open market." Defs. Exh. 100, ¶ 27. He states no factual basis for this assertion.

Moreover, I am hesitant to determine solely upon docket reports, that Pennexx, as opposed to Michael Queen, is in fact authorizing the actions taken in these pending actions. There is no deposition testimony or affidavit explaining who is authorizing these filings or by whom counsel is being paid.  Given that Pennexx has no assets and is not operating any business, I find that there is at least a question of fact as to whether Pennexx is the type of "empty shell" corporation whose continued existence will not preclude a finding of a *de facto* merger.

(3)

The third indicia of a *de facto* merger is the assumption by the successor of liabilities ordinarily necessary for uninterrupted continuation of the business.  There is no question of fact that Smithfield continued to pay Pennexx's debts and expenses necessary to keep the meat processing business running after Showcase took over, including payments under the Commerce Lease.[29]

(4)

The final indicia of a *de facto* merger is continuity of the management, personnel, physical location, and the general business operation.  <u>Continental</u>, 810 A.2d at 135.  In <u>General Battery</u>, <u>supra</u>, the Third Circuit Court of Appeals found such continuity of enterprise under the following factual scenario:

---

[29]  Smithfield does not attack this element in its Motion.  Debtor further proffers a list of numerous expenses paid by Smithfield, to which Smithfield raises no objection.  Debtor's Mem. at 48-49 and n. 77.

> General Battery purchased all of Price Battery's equipment and
> inventory, assumed tenancy of its manufacturing plant, and
> continued its production of batteries. The plant superintendent
> and middle managers retained their positions, as did the union
> employees, office personnel and sales force. General Battery
> continued the employment of three senior Price Battery
> executives-the president, executive vice president, and vice
> president of manufacturing-who, among other duties, remained
> active in supervising the Hamburg plant.

423 F.3d at 305-06.  Here it is undisputed that Showcase assumed tenancy of the Tabor Road

Facility, continued production of case-ready meats at that facility for over a year, and

continued serving Pennexx's customers, even if it did so through a different corporate form.

Moreover, while there may have been some changes in the higher level management

positions,  Showcase hired most of the middle management and all the hourly employees

formerly employed by Pennexx.

The summary judgment record not only raises issues of fact as to the presence of each

factor, but in some case leans toward a finding that they are met.  There is more than enough

on this record to deny the Motion with respect to this theory of successor liability,

particularly given that the above-discussed factors are not conjunctive.

B.  Fraudulent Transfer

Additional exceptions to the general rule of non-liability for a transferee of assets

include instances  where the transaction was fraudulently entered into in order  to escape

liability and where the transfer was without adequate consideration and no provisions were

made for creditors of the selling corporation.  Polius, 802 F.2d at 78; Continental 810 A.2d

at 130.  Defendants assert that the proper inquiry is therefore whether the Asset Transfer was

a fraudulent conveyance under Pennsylvania's Uniform Fraudulent Transfer Act, 12 Pa.

C.S.A. § 5104 ("PUTFA"), a standard which Asousa does not contest.   Section 5104 states:

> (a) General rule.--A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa.C.S.A. § 5104.   Thus, under PUFTA there are two different types of fraudulent

transfers: those made with actual intent to defraud (subpart (a)(1)) and those in which intent

need not be shown, i.e they are constructively fraudulent (subpart (a)(2)).   In determining

intent for purposes of subpart (a)(1), the statute provides numerous "badges of fraud"

including whether "the value of the consideration received by the debtor was reasonably

equivalent to the value of the asset transferred or the amount of the obligation incurred."

12 Pa. C.S.A. § 5104 (b)(8).   Whether the transfer was made without an exchange of

"reasonably equivalent value" is also the first element of a constructively fraudulent transfer

under § 5104(a)(2).

Whether reasonably equivalent value was exchanged is an inherently factual issue to

be determined on a case-by-case basis.  <u>Hemstreet v. Brostmeyer (In re Hemstreet)</u> 258 B.R.

134, 138 (Bankr. W.D. Pa. 2001).  As noted above, there are significant questions of fact as

to the value of the Collateral.  Even without its own expert, Asousa has identified issues of

fact raised by the VRC Report which preclude me from determining on summary judgment

that Smithfield provided reasonably equivalent value for the Asset Transfer.[30]  For example,

notwithstanding that Collateral is clearly defined by the Security Agreement to include

intangibles, Smithfield told VRC to exclude any such assets from its analysis.  Service Order

Form (Pls. Ex. 112); Deposition of Joseph J. Mickle ("Mickle Dep.") at 30 (Pls. Ex. 16).

"General Intangibles" under the Security Agreement clearly includes "rights under leases,"

<u>i.e</u> the Commerce Lease.  Security Agreement §§ 1.1, 2.1(e).  Mickle did not even review the

Commerce Lease until the day before his deposition.  <u>Id.</u> at 66-67.  When questioned on this

issue, Mickle testified as follows:

> Q: When you're appraising assets of a company, is it typical to
> include an operating lease within those assets?
>
> A: No
>
> Q: And why would that be?
>
> A: Because they're not owned by the company.
>
> Q: Is there a value that can be realized from the assets under an
> operating lease?

---

[30]  For this reason, I need not address the parties dispute as to who bears the burden of
proof or the proper valuation standard, <u>i.e</u> replacement, fair market, or liquidation.

A: Not to my knowledge.

Mickle Dep. at 161.  I find Mickle's out-of-hand dismissal of the potential for any value to the lease to be unpersuasive.  First, it appears that the exclusion of the lease was at the request of Smithfield rather than an independent determination by VRC.  Supra n. 22. Second, he provides no basis for his conclusion that no value can be realized.  I note that the Commerce Lease does include a purchase option, something that Mickle does not address. Master Lease Agreement ¶ 8.  (Defs. Ex. 21).  I am not convinced for the purpose of granting summary judgment, that the Commerce Lease has no calculable value.

The Security Agreement also includes within the definition of Collateral all "inventory," i.e "raw materials, work in progress, finished goods, returned goods and materials and supplies of any kind, nature or description which are or might be used in connection with the manufacture, packing, shipping" of goods.  (Defs. Ex. 9 at 3).  As the record indicates that the Tabor Road Facility remained in operation following the Asset Transfer, there must have been an inventory of such items, yet the VRC Report specifically excluded inventory without any explanation.  Exhibit C to VRC Report at 7.  (Defs. Ex. 69).

With regard to the Real Property valuation, the VRC Report provides  a "base square foot" valuation for the Tabor Road Facility of $41.67, with adjustments raising that figure to $64.49 per square foot.  Exhibit C to VRC Report at 30 (Defs. Ex. 69).  Mr. Mickle, who did not perform the valuation of the real estate, could not explain whether this figure encompasses a difference between refrigerated and non-refrigerated space.  Mickle Dep.

at 133.[31]  In contrast, Smithfield's engineer, Mr. Timmons stated that refrigerated space is more expensive and therefore provided a "replacement cost" of $175 per square foot. Timmons Dep. at 31-34 (Pls. Ex. 15); Timmons' Valuation E-mail (Pls. Ex. 61).  Mr. Timmons' valuation is admittedly based on the cost of new construction, which is not the same as the "fair market value" definition used by VRC, i.e the most probable price that the subject property would bring in a competitive and open market.  Exhibit C to VRC Report at 5 (Defs. Ex. 69).  Nor is it clear if Timmons excluded refrigeration equipment subject to the Commerce Lease as VRC did.  Timmons Dep. at 33.  (Pls. Ex. 15).  Notwithstanding this "apples and oranges" comparison, Timmons nevertheless states that there should be a difference in how the two types of space are valued.  As I cannot conclusively determine VRC's position on this issue, it shall have to be presented at trial.

Finally, Asousa raised sufficient credibility issues with regard to the VRC Report. VRC reduced the Real Property valuation by $2.719 million to account for the fixed equipment subject to the Commerce Lease.  However, VRC did not independently review the Commerce Lease or value that equipment, relying solely upon a list and value estimate provided by Smithfield.  Id. at 3; Mickle Dep. at 59 (Pls. Ex. 16).  When presented with and questioned about the list of leased equipment provided to VRC (not submitted into this record) Mr. Mickle conceded that he erroneously deducted $40,000 from the real estate

---

[31] The base square foot figure appears on a page of the Real Property Valuation titled "Calculator Replacement Cost Estimate."  A list of various "adjustments" follows the "base square foot cost," including "Cold Storage." The adjustment amount for Cold Storage is zero. Exhibit C to VRC Report at 30.

valuations. Mickle Dep. at 114.[32]  In addition, he could not state with certainty as to whether

an additional $1.9 million of the deductions also contained components that were erroneously

discounted from the real estate value.  Id. at 114-15.

Because I find significant issues of fact raised by the VRC Report itself, I cannot

determine on summary judgment whether reasonably equivalent value was exchanged for the

Collateral seized by Smithfield.  As such, I cannot determine whether there was a fraudulent

transfer that would provide a basis for successor liability against Smithfield.


Count II Breach of Fiduciary Duty

Count II of the Amended Complaint alleges breach of fiduciary duty against

Smithfield and joint and several liability against its representatives on the Pennexx Board,

Luter, and Cole.[33]  Asousa does not dispute Defendants' statement of Pennsylvania law:

Though shareholders generally do not owe a fiduciary duty to a corporation, such a duty can

arise with regard to dominant or controlling shareholders.  Miller v. Dutil (In re Total

Containment, Inc.), 335 B.R. 589, 603 (Bankr. E.D. Pa. 2005) (emphasis added).  Once the

_____

[32]  Mr. Mickle also conceded that he had no experience with valuing real estate and that
the Real Property valuation was prepared by another member of the VRC team.  Mickle's
involvement was simply to provide information regarding the value of fixed equipment covered
by the Commerce Lease, which was in turn provided to him by Mr. Beltrami.  Id. at 53, 59.

[33]  The original Complaint alleged that Luter and Cole, as directors of Pennexx, owed and
breached their independent fiduciary duties to Pennexx's creditors.  Compl. ¶ 46.  The Amended
Complaint drops that theory and alleges that only Smithfield had a fiduciary duty, but that as
officers of Smithfield, Luter and Cole caused Smithfield to breach its duty.  The Amended
Complaint therefore seeks to hold Luter and Cole jointly and severally liable for Smithfield's
breach.  Amended Compl. ¶¶ 46-48.

corporation becomes insolvent, the fiduciary duty of those controlling shareholders is owed to corporate creditors. Id at 604 (citing Travelers Casualty and Surety Co. v. Irex Corp., 2002 WL 32351176, at *3 (E.D. Pa.2002)).  It is undisputed that Pennexx was insolvent as of September 30, 2002.  Asousa contends that Smithfield was a controlling shareholder of Pennexx and therefore owed a fiduciary duty to creditors as of that date, which they violated.

Smithfield's ownership of 50% of Pennexx stock, without more, did not give it control of Pennexx. Baron v. Pritzker, 52 Pa. D. & C.4th 14, 2001 WL 1855054, at *6 (Pa. Com. Pl. 200) (only where owner of 50% of corporation shares also had two-thirds vote of board did fiduciary duty arise).  Smithfield held only two of five seats on the Pennexx Board.  That it could not exercise control over Pennexx through its ownership and director seats is demonstrated by the Board's decision to issue more stock in September 2002 against the votes of Luter and Cole.

Neither party has provided any Pennsylvania authority as to what a 50% shareholder must do to become a "controlling" shareholder.  Moreover, this question is made more difficult by the fact that Smithfield held dual roles as shareholder and a lender under the Credit Agreement.  Pennsylvania law will find a business association, including a lender-borrower relationship, to be the basis for a fiduciary relationship "'if one party surrenders substantial control over some portion of his affairs to the other.'" Bank v. BJ's Wholesale Club, Inc., --- F.Supp.2d ----, 2006 WL 1000058, at *6 (M.D. Pa. April 13, 2006) (citations omitted); PTI Converted Paper Products, Inc. v Stone Container Corp., 1995 WL 434577, *2 (E.D. Pa. July 24, 1995).  See also Busy Bee, Inc. v. Wachovia Bank, N.A.,

2006 WL 723487, * 22 (Pa. Com. Pl. 2006) (citing <u>G.E. Capital Mortgage Services, Inc. v.</u> <u>Pinnacle Mortgage Investment Corp.</u>, 897 F.Supp. 854, 863 (E.D. Pa. 1995)). In <u>PTI</u> the plaintiff was in the business of selling pizza boxes, which it purchased from the defendant. The plaintiff alleged that it had an arrangement with the defendant whereby it supplied the defendant with its customer list, and the defendant shipped the boxes directly to the plaintiff's customers. The court ruled that the plaintiff had stated a valid claim for breach of fiduciary duty, reasoning that the arrangement "arguably constitute[d] the surrendering of substantial portions of [its] affairs to the other." 1995 WL 434577 at *2.

In the lending context, substantial control over the borrower's business affairs may be demonstrated by evidence that: (1) the lender became involved in the actual day-to-day management and operations of the borrower; or (2) the lender has the ability to compel the borrower to engage in unusual transactions.  <u>Busy Bee</u>, <u>supra</u>, at *22 (citing <u>Clark v. U.S.</u> <u>Bank National Association</u>, 2004 WL 2297403, *3 (E.D. Pa.2004); <u>I & S Associates Trust</u> <u>v. LaSalle National Bank</u>, 2001 WL 1143319, *7 (E.D. Pa.2001); <u>Gonzalez v. Old Kent</u> <u>Mortgage Co.</u>, 2000 WL 1469313, *6 (E.D. Pa.2000); <u>Phoenix Four Grantor Trust # 1 v. 642</u> <u>N. Broad Street Associates</u>, 2000 WL 876728, *7 (E.D. Pa.2000)).  The amount of control exerted by the lender necessarily is a fact-intensive inquiry.  <u>GE Capital</u>, <u>supra</u>.

Asousa raises numerous "examples" of Smithfield's control of Pennexx, including that Smithfield controlled the acquisition and renovation of the Tabor Road Facility.  I have found that there are factual disputes as the roles of Pennexx and Smithfield in that respect.  While renovation of the facility may not have been part of the day-to-day operation of Pennexx's

business, the seven-month period was not an insubstantial amount of time and the renovations clearly had some effect on Pennexx's productivity. Moreover, Asousa identifies evidence that Smithfield "lent" Pennexx some its employees to help in other areas of Pennexx's operations. Lunking Dep. at 139 ("Smithfield lent to Pennexx the expertise of various people . . . There was a lot of manpower and time and effort put into the Pennexx business to help them run more efficiently"). There are disputed issues of fact as to whether Smithfield was sufficiently involved in Pennexx's day-to-day operations so as to give rise to a fiduciary duty.

Moreover, the record indicates a possibility that the Commerce Transaction falls within the "unusual transaction" example of control. In Busy Bee, supra, such control was found where the lender refused further credit unless the borrower abandoned and liquidated a successful discount retail line of business. 2006 WL 723487 at *22-23. Here, the Commerce Transaction appears to have been instigated at Smithfield's request so as to repay its debt. There are issues of fact surrounding this transaction, i.e. whether it was beneficial or harmful to Pennexx and whether Pennexx entered into the transaction, or at least agreed to certain of its terms, under duress of Smithfield withholding its guarantee at the eleventh hour.

Assuming Smithfield had a fiduciary duty to creditors of Pennexx, merely adhering to its agreement with Pennexx, i.e. the Forbearance Agreement, and enforcing its legal and contractual rights as a creditor does not constitute a breach of a separate duty. See Busy Bee, supra at 27. It does however, have a fiduciary's burden of proving the fairness of the Asset

Transfer.  As noted, there are significant questions of fact as to the value of the Collateral and thus whether Defendants took more value in the Asset Transfer than the amount of the debt owed by Pennexx.  There is also a question of fact as to whether Defendants forced the Commerce Transaction upon Pennexx and whether that transaction was beneficial or harmful.  Finally, as discussed more fully below, there is a question of fact as to whether Showcase authorized the conversion of rent monies allegedly held in escrow for rent on the Premises during Pennexx's lease dispute with Asousa.  The Motion is denied as to Count II.

<u>Counts III and IV - Conversion and Turnover</u>

Counts III and IV seek, under state and bankruptcy law, a return of $55,961.12 in rent monies that Pennexx was allegedly holding in escrow during the lease dispute with Asousa (the "Rent Monies").[34]  Smithfield's counsel presents the affidavit of John Gallagher, Pennexx's counsel in the Pennexx Litigation, attesting to the existence of a separate account at PNC Bank into which Pennexx paid rent from November 2000 to June 2002.  Gallagher Aff. ¶ 5 (Defs. Ex. 96).  There is evidence that such an account existed and Pennexx, Queen, and Paul Baker Bartle, a partner in Gallagher's firm, High, Swartz, Roberts, & Seidel (the "High Swartz firm") are identified as "escrow agents."  PNC Statement dated April 30, 2002 (Pls. Ex. 36).  While Gallagher states that Pennexx deposited rent directly into the PNC Account, memos from Beltrami to Smithfield in August 2003, indicate that rent payments

---

[34]  Though the record appears to indicate that Pennexx put aside approximately $153,000 in disputed rent, (Pls. Ex. 19; 36), Asousa seeks only $55,961.12.

-34-

were made to the High Swartz firm and question whether all those payments were in fact deposited into the PNC Account.  (Pls. Ex. 19, 38).

Gallagher also states  that Queen authorized various disbursements that drained the PNC Bank account.  Gallagher Aff. ¶¶ 12-18.  However, Beltrami's August memo indicates that on or about June 6, 2002, the PNC Account was emptied into the Interest on Lawyer Trust Account ("IOLTA") established by High Swartz pursuant to Rule 1.15 of the Pennsylvania Rule of Professional Responsibility.  (Pls. Ex. 19).  It appears that the disbursement of the sought-after Rent Monies was by check drawn from the IOLTA account on June 10, 2003, payable to Pennexx, and deposited that same day in the Pennexx bank account.  See  Check for $55,961.12 payable to Pennexx, drawn upon IOLTA Account of High, Swartz, Roberts, & Seidel, dated June 10, 2003 (Pls. Ex. 37); Beltrami Memo at SFD00017311 (Pls. Ex. 39).  By terms of the Forbearance Agreement approved by the District Court, this account passed along with the Collateral into Smithfield's possession as of June 9.  Liegel Aff. ¶ 17.[35]

Defendants argue that Asousa cannot prove entitlement to the Rent Monies because it cannot prove the existence of an escrow agreement.  "To establish the existence of an escrow relationship, a plaintiff must establish that an agreement existed between the parties, the conditions of which were communicated to the depositary, who accepted its terms and

---

[35] Smithfield continued to use Pennexx's bank accounts for some period of time following the Asset Transfer until it established its own accounts.  Liegel Aff. ¶ 19; Beltrami Dep. at 52-53 (Pls. Ex. 1); Stevens Dep. 70-71 (Pls. Ex. 5).  Smithfield made deposits into those accounts and paid expenses though it appears it may have done so through a subsidiary.  Liegel Dep. at 109-110 (Pls. Ex. 2).

agreed to be bound by them." <u>Struck v. Binns</u>, 1995 WL 57481, at *3 (E.D. Pa. February 10, 1995). An escrow agreement may be in writing, oral, or partly in both. <u>Id.</u>

The record appears to indicate that the Rent Monies were either in the PNC Account to which a partner in the High Swartz firm was a signatory or in its IOLTA account at the time they were dispersed. As Defendants' own cited authority notes, an attorney for one of two disputing parties can act as an escrow agent for both. <u>Janson v. Cozen and O'Connor</u>, 676 A.2d 242, 247 (Pa. Super. 1996). It is the intention of the parties which is controlling. <u>Id.</u> Gallagher concedes representing to this Court that an account had been established in which Pennexx was placing its rent.[36] Pennexx represented on SEC statements that the disputed rent payments on the Premises were being put into "escrow." (Pls. Ex. 49 at 15). The PNC Account statement indicates three "escrow" agents. This is more than sufficient to raise an issue of fact as to whether an escrow agreement existed.

Nor am I impressed on this record by Defendants' argument that the withdrawal of the Rent Monies was a rogue act by Mike Queen acting on behalf of Pennexx. The check was drawn the day after the Asset Transfer, <u>i.e</u> when Smithfield had possession of all Collateral, including the Pennexx bank account into which the check was deposited.

---

[36] Neither Asousa nor Defendants provided the transcripts of the proceedings in which Gallagher made his representations to the Court. Gallagher's affidavit states that he "did not represent [to the Court] that Asousa had a right, entitlement, or interest to the monies in the [PNC] Account" <u>Id.</u> I would not expect he would make such a statement given that Asousa's entitlement to rent was in dispute in the Pennexx Litigation. Indeed, a dispute over rights to funds is often the impetus for establishment of an escrow account. It is irrelevant whether Pennexx believed Asousa had a right to the funds. The issue is whether Pennexx and Asousa intended rent payments to be segregated pending the outcome of their dispute.

Moreover, this portrayal of Queen is at odds with the testimony from several Smithfield employees that he had no authority following the Asset Transfer.  Finally, assuming Mike Queen did request the disbursement, Joseph Beltrami, Showcase's CFO, concedes that he was aware of Queen's request on that day.  (Pls. Ex. 38).  Summary judgment is denied as to Counts III and IV.[37]

An Order consistent with this Memorandum Opinion shall issue.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated:   June 15, 2006

---

[37] Count V is entitled "Supplemental Relief in Aid of Execution."  The parties are in agreement that it is not a substantive cause of action but rather is dependent upon Asousa's success on one of the other substantive claims.  As I have denied summary judgment on those counts, it follows that I must do so here.

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| ASOUSA PARTNERSHIP, | : | Bankruptcy No. 01-12295DWS |
| | : | |
| Debtor. | : | |

| | | |
|---|---|---|
| | : | |
| ASOUSA PARTNERSHIP, | : | Adversary No. 04-1012 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SMITHFIELD FOODS, INC., a Virginia Corporation, | : | |
| SHOWCASE FOODS, INC., a Delaware Corporation, | : | |
| JOSEPH W. LUTER, IV, MICHAEL H. COLE, | : | |
| | : | |
| Defendants. | : | |

# ORDER

**AND NOW** this 15th day of June 2006, upon consideration of the Motion for Summary Judgment (the "Motion") of defendants Smithfield Foods, Inc. ("Smithfield"), Showcase Foods, Inc. ("Showcase"), Joseph W. Luter, IV and Michael H. Cole (collectively "Defendants"), and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that the Motion is **DENIED**.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Copies to:

Steven M. Coren, Esquire
KAUFMAN, COREN, RESS & WEIDMAN, P.C.
1525 Locust Street, 17th Floor
Philadelphia, PA 19102

Milind M. Shah, Esquire
REED SMITH, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301

Edward J. Fuhr, Esquire
Eric H. Feiler, Esquire
Jessica M. Erickson, Esquire
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219-4074

Dave P. Adams, Esquire
Office of the U.S. Trustee
833 Chestnut Street
Suite 500
Philadelphia, PA 19107